Slip Op. 07-138

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
SHANGHAI ESWELL ENTER. CO.,      :
LTD.; JINFU TRADING CO., LTD.;   :
and ZHEJIANG NATIVE PRODUCE      :
AND ANIMAL BY-PRODUCTS IMPORT    :
& EXPORT GROUP CORP.,            : Before: Richard K. Eaton, Judge
                                 :
          Plaintiffs,            : Court No. 05-00439
                                 :
          v.                     : Public Version
                                 :
UNITED STATES,                   :
                                 :
          Defendant,             :
                                 :
          and                    :
                                 :
THE AMERICAN HONEY PRODUCERS     :
ASSOCIATION OF AMERICA AND       :
THE SIOUX HONEY ASSOCIATION,     :
                                 :
          Deft.-Ints.            :
_____   :
```

OPINION AND ORDER

[United States Department of Commerce's final results are
sustained in part and remanded.]

Dated: September 13, 2007

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce
M. Mitchell*, *Ned H. Marshak, Adam M. Dambrov*, *Paul G. Figueroa*),
for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*,
Director, Commercial Litigation Branch, Civil Division, United
States Department of Justice (*David S. Silverbrand*); Office of
the Chief Counsel for Import Administration, United States
Department of Commerce (*Douglas S. Ierley*), for defendant.

*Kelley Drye Collier Shannon* (*Michael J. Coursey*, *Adam H. Gordon*
and *R. Alan Luberda*), for defendant-intervenors.

Eaton, Judge: This matter is before the court on the Rule 56.2 motion for judgment upon the agency record of plaintiffs Shanghai Eswell Enterprise Co., Ltd. ("Shanghai Eswell"); Jinfu Trading Co., Ltd. ("Jinfu PRC"); and Zhejiang Native Produce and Animal By-Products Import & Export Group Corp. ("Zhejiang") (collectively, "plaintiffs"). *See* Pls.' Br. Supp. R. 56.2 Mot. J. Agency R. ("Pls.' Mem."). Defendant the United States and defendant-intervenors the American Honey Producers Association and the Sioux Honey Association oppose the motion. *See* Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Opp'n"); Def.-Ints.' Br. Opp'n Pls.' Mot. J. Agency R.

By their motion, plaintiffs challenge certain aspects of the final results of the United States Department of Commerce's ("Commerce" or the "Department") second administrative review of the antidumping duty order on honey from the People's Republic of China ("PRC") for the period of review beginning on December 1, 2002, and ending on November 30, 2003 ("POR"). *See* Honey from the PRC, 70 Fed. Reg. 38,873, 38,874 (Dep't of Commerce July 6, 2005) (final results) and the accompanying Issues and Decision Memorandum (June 27, 2005), Pub. Doc. 341 ("Issues & Dec. Mem.") (collectively, "Final Results"). Jurisdiction is had pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000). For the reasons set forth below, the court sustains the Final Results in part and remands this case to Commerce for

further action consistent with this opinion.


                        STANDARD OF REVIEW

     The court reviews the Final Results under the substantial

evidence and in accordance with law standard set forth in 19

U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful

any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

not in accordance with law . . . ."). "Substantial evidence is

'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp.

(30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

It "requires more than a mere scintilla, but is satisfied by

something less than the weight of the evidence." *Altx, Inc. v.

United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal

quotation marks & citations omitted). The existence of

substantial evidence is determined "by considering the record as

a whole, including evidence that supports as well as evidence

that 'fairly detracts from the substantiality of the evidence.'"

*Huaiyin (30)*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v.

United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The

possibility of drawing two equally justifiable, yet inconsistent

conclusions from the record does not prevent the agency's

determination from being supported by substantial evidence.  *See*

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also*

*Altx, Inc.*, 370 F.3d at 1116.  The court "must affirm

[Commerce's] determination if it is reasonable and supported by

the record as a whole, even if some evidence detracts from

[Commerce's] conclusion." *Nippon Steel Corp. v. United States*,

458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks &

citation omitted).


                                DISCUSSION

I.   Normal Value

        In determining whether the subject merchandise is being, or

is likely to be, sold at less than fair value, 19 U.S.C.

§ 1677b(a) requires Commerce to make "a fair comparison . . .

between the export price[1] or constructed export price[2] and normal

value."   When merchandise that is the subject of an antidumping

---

        [1]     The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted.  19
U.S.C. § 1677a(a).

        [2]     "Constructed export price" is "the price at which the
subject merchandise is first sold . . . in the United
States . . . by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or
exporter," as adjusted.  19 U.S.C. § 1677a(b).

investigation is exported from a nonmarket economy ("NME")[3]

country, such as the PRC, Commerce, under most circumstances,

determines normal value by valuing the factors of production used

in producing the merchandise using surrogate data, to which it

adds "an amount for general expenses and profit plus the cost of

containers, coverings, and other expenses."  19 U.S.C.

§ 1677b(c)(1).

The facts surrounding Commerce's selection of surrogate data

to value raw honey and to derive selling, general and

administrative expenses ("SG&A"); overhead; and profit

("surrogate financial ratios") are not new to the court.

Commerce's construction of normal value for raw honey is the

subject of another challenge to Commerce's second administrative

review of the antidumping duty order on Chinese honey in *Wuhan*

*Bee Healthy Co. v. United States*, 31 CIT __, Slip Op. 07-113

(July 20, 2007) (not reported in the Federal Supplement)

---

[3]     A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT __,
__, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, since the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate
data from India.  *See* 19 U.S.C. § 1677b(c)(4).

("*Wuhan I*").

A.   Valuation of the Factors of Production

With respect to Commerce's construction of normal value, plaintiffs first challenge Commerce's decision, when valuing raw honey, to rely exclusively on surrogate data from India taken from a Web site maintained by EDA Rural Systems Pvt. Ltd., an Indian organization that provides business development services to the honey and beekeeping sector ("EDA Data").[4]  Pls.' Mem. 2. Based on this data, Commerce derived an average price for raw honey of 74.90 Rupees per kilogram during the POR.  *See* Factors of Production Valuation Mem. for the Final Results, Pub. Doc. 340 ("Final FOP Mem.") at 2.  In deciding to use EDA Data exclusively in valuing raw honey, Commerce rejected articles from three

---

[4]     In the Final Results, Commerce explained its decision to value raw honey with EDA Data: "[T]he EDA Data . . . constitute[s] a[n] . . . appropriate surrogate value source for this POR.  [It is] . . . the best information currently available because it is publicly available, quality data, specific to the raw honey beekeeping industry in India, and contemporaneous with the POR."  Issues & Dec. Mem. at 10.  With respect to quality, Commerce found that "the EDA Data source is highly documented, including numerous specific price points over a six year period for multiple types of honey from many suppliers, and includes detailed information on production, inputs, and beekeepers."  *Id*. at 10-11.  With respect to specificity, Commerce noted that "the prices quoted in the EDA Data are specific to the raw honey beekeeping industry in the state of Bihar in India."  *Id*. at 11. With respect to contemporaneity, Commerce found that "the EDA Data is contemporaneous to this administrative review . . . and it includes monthly data points over a majority of the POR."  *Id*. (footnote omitted).

sources: (1) *Hindu Business Line*;[5] (2) *Indiainfoline*;[6] and (3)

*Indian Express*.[7]

Plaintiffs insist that it was unreasonable for Commerce to

rely exclusively on the EDA Data to value raw honey and that

Commerce should have averaged the EDA Data with that found in the

three publications. Pls.' Mem. 11-16. In *Wuhan I*, the court

upheld Commerce's rejection of the articles. First, with respect

to the *Hindu Business Line* article, the court found:

> Commerce was justified in rejecting the *Hindu
> Business Line* article. In a single sentence
> the article states a range of prices received
> by a single producer, the Girijan Co-
> operative Corporation Ltd. The EDA Data, on
> the other hand, contains information on
> numerous producers and therefore represents a
> wider range of prices. In addition, there is
> no indication that the sources of the data
> contained in the *Hindu Business Line* article
> are publicly available.

*Wuhan I*, 31 CIT at __, Slip Op. 07-113 at 32 (citations to record

omitted). Next, the court found no error in Commerce's

conclusion that the *Indiainfoline* article was unreliable:

> Commerce found that unlike the EDA Data, the
> sources of which were well-documented and
> made available by a business entity, the
> *Indiainfoline* article contained nothing to

---

[5]    "Girijan co-op targets Rs 135-cr turnover" (dated Apr.
17, 2003).

[6]    "Prospects of Bee Keeping in Rubber Plantations of
Kerala" (dated Sept. 2, 2003).

[7]    "In Jharkhand, it's all about honey, honey" (dated Feb.
17, 2003).

> indicate it was reliable.  In particular,
> there was "no additional information on the
> author's qualifications or the sources of his
> information" other than his status as a
> first-year business student.

*Id.*, 31 CIT at __, Slip Op. 07-113 at 32-33.  Finally, the court

sustained Commerce's decision not to rely on the *Indian Express*

article noting that it was not "as representative as the EDA Data

because it pertained to the experience of only a single

beekeeper."  *Id.*, 31 CIT at __, Slip Op. 07-113 at 33.  Because

the facts here are the same as those in *Wuhan I*, the court

follows its conclusions in that case and finds that Commerce's

decision not to average the EDA Data with the data found in the

three articles was reasonable.

In addition to the arguments made in *Wuhan I* concerning the

EDA Data, plaintiffs make additional claims, the principal one

being that Commerce did not adequately consider the decline in

prices in the second half of the POR.  Pls.' Mem. 10.  In

particular, plaintiffs cite information they placed on the record

from the World Trade Atlas, which indicated a decline in export

prices during the second half of the POR (July 2003 to November

2003), from one hundred twelve Rupees per kilogram to eighty-four

Rupees per kilogram.  Pls.' Mem. 11 (citing Respondents' Second

Surrogate Value Submission (Jan 8, 2005), Pub. Doc. 257, Ex. 1).

Plaintiffs argue that Commerce's failure to consider this and

other record evidence renders its determination unacceptably

flawed.

Defendant maintains that "Commerce did not base its valuation of honey solely upon the first half of the [POR], prior to the second half decline in prices, but rather, did take price decline into consideration." Def.'s Opp'n 17 (internal quotation marks, citation & ellipsis omitted). As evidence that Commerce considered the price decline, defendant points to Attachment 1 to Commerce's Final FOP Memorandum. Def.'s Mem. 16.

Plaintiffs respond that "[t]he Government's characterization of the Department's analysis is simply wrong." Pls.' Reply 7. Plaintiffs maintain that Attachment 1 to the Final FOP Memorandum contained prices taken from the EDA Data for the first half of the POR only, i.e., from December 2002 to June 2003, "which steadily increased from 62 Rs/kg in December 2002 - January 2003, to 73 Rs/kg in March - April 2003, to 87 Rs/kg in May - June 2003." Pls.' Reply 7-8. To determine the value of honey for the second half of the POR, however, Commerce used data solely from the month of October, and then adjusted it for inflation. Plaintiffs assert that Commerce took a price for honey from October 2002, "which the Department inflated to reflect a change in India's [wholesale price index, or "WPI"], without taking into consideration the evidence that honey prices in India had declined during the second half of 2003." Pls.' Reply 8.

An examination of the record leads the court to find that

Commerce did not adequately explain how it took into consideration evidence of a decline in prices during the second half of the POR.  There appears to be no dispute that a decline in the price of raw honey took place during that period.  *See* Pls.' Mem. 10; Def.'s Opp'n 16.  In the Final FOP Memorandum, however, Commerce indicated that it calculated a surrogate value for raw honey by taking a "weighted average of the price for each month from December 2002 through June 2003 based on the percentage of each type of honey produced and sold."  Final FOP Mem. at 2.  For the second half of the POR, it took the value reported in only one month, i.e., October 2002 (60 Rupees per kilogram) and adjusted it upward to take account of inflation. The result was a price of 61.93 Rupees per kilogram.  Final FOP Mem., Attach. I.

Commerce has not explained how inflating the price of raw honey takes into consideration the record evidence showing raw honey prices declined in the second half of the POR.  "An agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations.  Explanation is necessary . . . for this court to perform its statutory review function."  *Int'l Imaging Materials, Inc. v. United States Int'l Trade Comm'n*, 30 CIT __, Slip Op. 06-11 at 13 (Jan. 23, 2006) (not published in the Federal Supplement) (internal alteration, quotation marks &

citations omitted); *see also Tourus Records, Inc. v. DEA*, 259

F.3d 731, 737 (D.D.C. Cir. 2001) ("A fundamental requirement of

administrative law is that an agency set forth its reasons for

decision.") (internal quotation marks omitted).  On remand,

Commerce shall either (1) address the evidence cited by

plaintiffs and explain whether and how the observed decline in

prices during the second half of the POR is reflected in its

calculation of the value of raw honey; or (2) recalculate the

value to reflect a reasonable interpretation of the record

evidence concerning the decline.


     B.   Surrogate Financial Ratios: Choice of Data Source

     Next, plaintiffs claim that by declining to use the

financial statement of Apis (India) Natural Products ("Apis")

Commerce rendered the Final Results unsupported by substantial

evidence and not in accordance with law.  Pls.' Mem. 16-17.  This

issue was also addressed in *Wuhan I*, where the court sustained,

as reasonable, Commerce's decision to rely on Mahabaleshwar Honey

Producers Cooperative Society, Ltd.'s ("MHPC") financial

statement instead of Apis's financials:

          The court finds that Commerce was justified
          in determining that the 2003-2004 MHPC
          financial statement was the best available
          information to value factory overhead, SG&A
          expenses and profit.  It is apparent from the
          Final Results that Commerce examined both the
          MHPC and Apis financial statements and
          compared their quality, specificity and

    contemporaneity.  It then concluded based on
this examination that "the Apis financial
statement . . . is not a reliable source for
calculating the surrogate financial ratios
because it is neither complete, nor
sufficiently detailed to provide a reliable
source for surrogate values."  As Commerce
observed, "the Apis statement does not
include any auditor notes, nor does it appear
to include complete schedules or details on
Apis' operations."  The MHPC's statement, on
the other hand, "include[s] a complete annual
report, an auditors report, and complete
profit and loss and business statements that
segregate MHPC's honey and fruit canning
businesses."  Unlike Apis's statement, MHPC's
statement details its honey operations with
both narrative text and schedules indicating,
for example, the number of kilograms of honey
produced by particular MHPC members and the
price per kilogram.  The court thus finds
that Commerce's determination that the MHPC
financial statement was the best available
information to value financial ratios was
reasonable.

*Wuhan I*, 31 CIT at __, Slip Op. 07-113 at 47-48 (citations

omitted).  To the extent plaintiffs' arguments are identical to

those found in *Wuhan I*, the court follows its holding in that

case that the MHPC financial statement constitutes the best

available information.  *See* 19 U.S.C. § 1677b(c)(1) (surrogate

values "shall be based on the best available information . . . in

a market economy country or countries considered to be

appropriate by the administering authority"); *see also Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir.

1999).

    In addition to those arguments, plaintiffs also claim that

Commerce ignored evidence that: (1) the MHPC financial statement was "distorted by non-market forces" because "MHPC is a cooperative which does not operate as a true market entity"; and (2) the MHPC financial statement is distorted by the production of non-subject merchandise. Pls.' Mem. 24-25. With respect to the latter argument, plaintiffs claim that "MHPC's fruit canning division . . . affect[ed] the cooperative's financial performance, skewing the factory overhead and SG&A ratios." Pls.' Mem. 25.

Neither of these arguments persuades the court that remand is necessary. First, the Final Results demonstrate that Commerce took into consideration MHPC's status as a cooperative when making its determination that its financial statement was more reliable than Apis's financial statement. In particular, Commerce stated:

> [W]ith respect to respondents' assertion that MHPC does not operate as a true market entity because it is a cooperative, we disagree. Other than to note that loans to its members are not always repaid on time, which is not unusual in that many companies have provisions for bad loans, respondents have not cited evidence that supports their claim that MHPC's results are distorted by non-market forces.

Issues & Dec. Mem. at 19. An examination of the record demonstrates that, other than certain unpaid loans, plaintiffs can rely on no record evidence to support their claim. Rather, they rely on generalized statements. *See* Pls.' Mem. 24-25 n.15

("Companies generally loan money to vendors for business
purposes; they do not make personal loans to members.  MHPC's
unpaid loans to its members affect MHPC financial statements,
which in turn skew the ratios calculated by the Department.  This
is direct evidence that the cooperative nature of MHPC distorts
its financial results.").  Without supporting with record
evidence their claim that unpaid, personal loans made by MHPC to
its members actually affected MHPC's financial statement,
plaintiffs' generalized statement does not undermine Commerce's
finding that MHPC's status as a cooperative did not render its
financial statement unreliable.

     Plaintiffs' second claim also fails to demonstrate that
Commerce ignored evidence that the MHPC financial statement was
distorted by its fruit canning division.  Plaintiffs insist that
"[t]here is not a clear division of costs between MHPC's honey
and fruit canning operations in some of the schedules used by the
Department," and that some expenses included in the Department's
calculations, such as bank interest, travel expenses and building
depreciation, "include[d] expenses for both the honey and the
fruit canning divisions."  Pls.' Mem. 25.  Having considered
plaintiffs' arguments at the administrative level, Commerce found
that MHPC's financial statement sufficiently separated data
regarding its fruit canning and honey production divisions such
that Commerce could use the data on honey production to derive

surrogate financial ratios.  Specifically, Commerce found that

(1) "MHPC's financial statements are narrowly tailored to subject

merchandise"; (2) "the total asset value of non-subject

operations accounts for only 16.71 percent of MHPC's total asset

value"; and (3) "the Department has calculated a profit only from

the honey processing division."  Issues & Dec. Mem. at 18-19.

     Thus, while acknowledging that MHPC produced non-subject

merchandise in addition to the subject honey, Commerce found that

MHPC's financial statement sufficiently distinguished the costs

associated with the honey and fruit canning divisions such that

Commerce could derive surrogate financial ratios based solely on

honey data.  Indeed, a review of the MHPC financial statement

reveals that it contains separate tables pertaining to each

division, e.g., the "Fruit canning profit and loss statement" and

the "Fruit canning business statement."  Final FOP Mem., Attach.

II (MHPC financial statement) at 16 & 17.  In addition, the "Main

Journal Business Statement" specifically pertains to honey sale

and collection.  *See* Final FOR Mem., Attach. II ( MHPC financial

statement) at 15 (listing, *inter alia*, line items for "Honey

Sale," "honey collection," "Honey boxes Sale," "Honey machine

Sale," "honey collection (extracted)").  As with its claim with

respect to MHPC's status as a cooperative, plaintiffs have made

observations but have not demonstrated that Commerce was unable

to use the entries on MHPC's financial statement so as to create

an accurate picture of its honey business.

This Court has held that "[w]here there exist[] on the
record 'alternative sources of data that would be equally or more
reliable . . . it is within Commerce's discretion to use either
set of data.'" *Wuhan Bee Healthy Co. v. United States*, 29 CIT
__, __, 374 F. Supp. 2d 1299, 1304 (2005) (quoting *Geum Poong
Corp. v. United States*, 26 CIT 322, 326, 193 F. Supp. 2d 1363,
1369 (2002)). Contrary to plaintiffs' arguments, Commerce did
not fail to consider either MHPC's status as a cooperative or its
production of non-subject merchandise. In addition, plaintiffs
have failed to point to record evidence that the MHPC did not
"operate as a true market entity." Issues & Dec. Mem. at 19.
Plaintiffs have thus failed to make the case that the Apis
financial statement is more reliable than the MHPC financial
statement. In light of the foregoing, plaintiffs have failed to
establish that (1) the MHPC financial statement was unreliable,
either because the organization was a cooperative or because MHPC
produced non-subject merchandise, or that (2) the Apis financial
statement was more reliable than the MHPC financial statement.
Therefore, having considered Apis's financials, MHPC's financials
and Commerce's finding that MHPC's financials were more reliable
than Apis's, which was sustained in *Wuhan I*, the court sustains
Commerce's choice to rely on the MHPC financial statement.

C.    Surrogate Financial Ratios: Calculation of Ratios

Next, plaintiffs challenge (1) Commerce's failure to deduct
honey sales commissions from its calculation of SG&A; and (2)
Commerce's failure to treat MHPC's expenses for jars, corks and
honey machine purchases as direct raw materials.


(1) Honey Sales Commissions

In a market economy proceeding, Commerce is required to make
a "circumstances-of-sale" adjustment to (A) either export price
or constructed export price; and (B) normal value to account for
differences in direct selling expenses incurred in the U.S. and
foreign markets.  See 19 U.S.C. §§ 1677a(d)(1)(A) (providing for
the reduction in the price used to establish constructed export
price by the amount of any commissions for selling the subject
merchandise in the United States), 1677b(a)(6)(C)(iii) (providing
for adjustment to normal value for differences in circumstances
of sale).  Under Commerce's regulations, "direct selling
expenses" include "commissions . . . that result from, and bear a
direct relationship to, the particular sale in question."  19
C.F.R. § 351.410(c) (2005).  The purpose of the adjustment is to
ensure that export price and normal value are being compared on
an "equivalent basis" when Commerce makes its dumping
determination.  See Antidumping Manual, Ch. 8 at 16.

In an NME proceeding, on the other hand, "Commerce maintains

an established practice of not making circumstances-of-sale

adjustments in NME cases." *Shandong Huarong Mach. Co. v. United*

*States*, 30 CIT __, __, 435 F. Supp. 2d 1261, 1293 (2006).

Instead, Commerce "includes all standard selling expenses," which

Commerce has determined encompass sales commissions, in the SG&A

calculation.  Issues & Dec. Mem. at 22; *see also* Tapered Roller

Bearings and Parts Thereof, Finished and Unfinished, From the

PRC, 63 Fed. Reg. 63,842, 63,852-53 (Dep't of Commerce Nov. 17,

1998) (final results) ("[Commissions are] standard selling costs

and, as such, are properly categorized under SG&A.").  In the

Final Results, Commerce explained its practice of treating sales

commissions differently in market economy and NME proceedings:

> [I]t is not possible to deconstruct surrogate
> financial ratios at the level of detail that
> would be necessary to make [circumstances-of-
> sale] adjustments, because it is not known
> whether there is an exact correlation between
> the NME producer's and the surrogate
> producer's expenses.  Therefore, "the
> Department normally bases normal value . . .
> on factor values from a surrogate country on
> the premise that the actual experience in the
> NME cannot meaningfully be considered."

Issues & Dec. Mem. at 22 (quoting Tapered Roller Bearings and

Parts Thereof, Finished or Unfinished, From the Republic of

Romania, 61 Fed. Reg. 51,427, 51,429 (Dep't of Commerce Oct. 2,

1996) (final results)).  Accordingly, in the Final Results,

Commerce found that honey sales commissions should be included in

the calculation of the surrogate SG&A ratio as standard selling

expenses. *Id.*

Plaintiffs insist that Commerce's practice of not deducting commissions from SG&A in the NME context results in an inaccurate dumping margin because commissions were deducted from the U.S. price.[8]  Pl.'s Mem. 28-29.  They take the position that market economy cases and NME cases should be treated similarly with respect to the deduction of commissions:

> Insofar as the Department's calculation of normal value [in the NME context] is intended to achieve the same, reasonable, "apples to apples," no-double counting results, [Commerce] is required to apply the same basic rules in NME cases as it does when adjusting [export price/constructed export price] and [constructed value] for commissions in market economy proceedings.

Pls.' Mem. 28-29 (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT __, Slip Op. 04-88 (July 19, 2004) (not reported in the Federal Supplement)).  Plaintiffs insist that "in this case it is possible to make the adjustment because there is one adjustment at issue.  Moreover, . . . there is an exact correlation between the NME producer and the surrogate producer expense, namely the commission on honey sales expense."

_____

[8]  The "U.S. price" can be either the export price or the constructed export price.  "When an arm's-length transaction takes place between a foreign producer and an independent importer, U.S. price is calculated using the statutory Export Price (EP) provision; [constructed export price] is used when the foreign producer and the importer are affiliated." *Mittal Steel Point Lisas Ltd. v. United States*, 491 F. Supp. 2d 1222, 1226 (2007).

Pls.' Mem. 30.  In other words, plaintiffs contend that because

plaintiffs Shanghai Eswell and Zhejiang incurred selling

commission expenses in the sale of honey, there is an "exact

correlation" between these expenses and those incurred by the

surrogate MHPC.  *See* Respondents' Comments on the Application of

Surrogate Ratios (Dec. 3, 2004), Pub. Doc. 223, at 2; Shanghai

Eswell's Sec. C Questionnaire Resp. (Mar. 25, 2004), Conf. Doc.

17, at 24-26 & Ex. 1 (indicating commission expenses); Zhejiang

Sec. C Questionnaire Resp. (Mar. 25, 2004), Conf. Doc. 11, at 24

& Ex. 1 (same); Final FOP Mem., Attach. II (MHPC financial

statement) at 15 (indicating "honey sale commission" under

"Purchase" column).

The court finds remand appropriate here so that Commerce may

explain in more detail its decision not to deduct commissions

from the SG&A ratio.  In *Shandong Huarong Machinery Co.*, Commerce

refrained from making a circumstances-of-sale adjustment to

account for commissions that an NME producer paid, citing its

practice not to do so in the NME context.  There, the Court found

Commerce's explanation insufficient and remanded the matter to

Commerce:

> [I]t is apparent that Commerce's past
> practice to refrain from making
> circumstances-of-sale adjustments in NME
> situations is based on its conclusion that,
> in most such cases, there is not enough
> information on the record to make a
> determination based on substantial evidence.
> While this may be true in most cases, the

> court observes that Commerce does not cite
> any evidentiary basis for its determination
> in this case, other than its past practice.
> For that reason, the court remands this issue
> to Commerce to allow the agency to further
> explain its determination that the record
> here was devoid of substantial evidence to
> permit a circumstances-of-sale adjustment.

*Shandong Huarong Mach. Co.*, 30 CIT at __, 435 F. Supp. 2d at

1293.  As in *Shandong Huarong Machinery Co.*, Commerce did not

cite any evidentiary basis in the Final Results for its

determination not to deduct sales commissions.  Rather, the

Department relied on its past practice based on the general

notion that in NME cases the record does not contain sufficient

information to determine whether there is "an exact correlation

between the NME producer's and the surrogate producer's

expenses."  Issues & Dec. Mem. at 22.  Plaintiffs insist that

there is sufficient evidence of an exact correlation, namely the

record evidence showing that Shanghai Eswell, Zhejiang and MHPC

incurred selling commission expenses, and that Commerce deducted

selling commissions from Shanghai Eswell's and Zhejiang's U.S.

price calculations.  Because the Department did not discuss this

evidence, its determination is wanting.  *See Int'l Imaging*

*Materials, Inc.*, 30 CIT at __, Slip Op. 06-11 at 13.  The court

therefore remands this matter to allow Commerce to further

explain its determination that the record evidence was

insufficient to permit a circumstances-of-sale adjustment, or to

make a circumstances-of-sale adjustment.

(2) Jars, Corks and Honey Machine Purchases

Plaintiffs next take issue with Commerce's failure to
include MHPC's expenses for jars, corks and honey machines in its
financial ratio calculation as direct expenses used for producing
finished honey.  In the Final Results, Commerce supported its
decision not to include jars, corks and honey machines by
pointing to that portion of the MHPC financial statement where
those items "appear separately in both the 'Sales' and 'Purchase'
columns, independent of the 'Honey Collection' and 'Honey Sale'
line items . . . ."  Issues & Dec. Mem. at 23.  For Commerce,
these entries supported the conclusion that expenses for jars,
corks or honey machines were independent from honey production
and thus were not part of MHPC's finished product.  Therefore,
Commerce concluded that it "[would] not adjust the surrogate
revenue and will not adjust the [materials, labor and energy]
denominator to include the expenses for 'jars and corks' or honey
machines."  Issues & Dec. Mem. at 23.

Plaintiffs argue that the exclusion of expenses for jars,
corks and honey machines from Commerce's financial calculation is
not supported by record evidence.  They contend that, because the
MHPC financial statement shows that MHPC purchased different size
jars and corks, "the only reasonable explanation is that MHPC
sells its honey in jars [with] corks."  Pls.' Mem. 32.  Because
honey is "sold retail in different size jars, these jars and

corks costs should be treated as direct raw materials." Pls.'
Mem. 32. In addition, plaintiffs note that "[h]oney machines
process the honey for sale and are a vital part of the direct
materials." GDLSK 2nd Refiling of Admin. Case Br. (May 10,
2005), Conf. Doc. 108, at 33.

Plaintiffs further contend that Commerce erred by failing to
deduct an amount for jars and corks from the net revenue. "Given
that the starting figure to calculate profit encompasses the sale
of retail honey in jars," plaintiffs argue, "the only way for the
Department to calculate an accurate profit is by deducting all
costs from the revenue, including the costs for jars and corks."
Pls.' Mem. 33 (emphasis in original).

Defendant argues that Commerce's determination that
"expenses for jars, corks, and honey machines were not direct
expenses is supported by substantial evidence . . . ." Def.'s
Opp'n 33. Defendant contends, as Commerce did in the Final
Results, that because jars, corks and honey machines are listed
separately from expenses associated with honey production in the
MHPC financial statement these items were being bought and sold
but could not be tied to the production of finished honey. Thus,
defendant argues that "without supporting evidence that the items
were associated with or incorporated into the sale of subject
merchandise, Commerce determined that it would not adjust the
surrogate revenue or the denominator of the financial ratio

calculation to include expenses for jars and corks."  Def.'s
Opp'n 34.

The court remands for further explanation Commerce's finding
that jars, corks and honey machines were not direct materials in
the production of finished honey.  In the Final Results, Commerce
insists that it must "treat the financial statement line items as
they have been reported in the MHPC financial statement—
independent of sales and packaging."[9]  Issues & Dec. Mem. at 23.
The court has reviewed the chart on page 15 of the MHPC financial
statement, which contains the line items referenced by Commerce.
First, the court observes, as noted *supra*, that the chart
specifically pertains to honey sale and collection.  *See* Final
FOP Mem., Attach. II (MHPC financial statement) at 15.  Next, the
court notes that the chart contains line items for 250 gram, 500
gram and 1 kilogram jars; 53 millimeter and 38 millimeter corks;
and honey machines in both the "Sale" column and the "Purchase"
column.[10]  The line item for 100 gram jars appears only in the

---

[9]     Contrary to Commerce's statement, the chart does not
contain a line item for "packaging," but only "packing."
"Packaging" means "to present (as a product) in such a way as to
heighten its appeal to the public," while "packing" means
"material (as a covering or stuffing) used to protect packed
goods (as for shipping)."  Merriam-Webster Online Dictionary,
*available at* http://www.merriam-webster.com/.  Thus, while the
line items for jars and corks may understandably be set apart
from "packing," they may appropriately be considered "packaging,"
i.e., the presentation of the finished product to the public.

[10]    The MHPC financial statement indicates prices next to
                                              (continued...)

"Sale" column.  The chart is therefore ambiguous.  While it is
possible that MHPC buys and sells jars and corks that are either
empty or filled with something other than honey, there is no
evidence in the MHPC financial statement tending to support such
a conclusion.  Without further explanation the court cannot
accept as adequate Commerce's reliance solely on the line items
for jars and corks being separate from other line items, to
support its conclusion that they are not direct materials
associated with finished honey.

With respect to the purchase of honey machines, defendant's
assertion that "honey machines are a productive asset, not a
direct expense, for which Commerce would calculate depreciation,"
Def.'s Mem. 34, is raised for the first time in its papers before
this court and cannot take the place of Commerce's own reasoning
on this issue in the Final Results.  *See Burlington Truck Lines,*

---

[10](...continued)
the line items for jars, corks and honey machines:

| Sale | Rs. | Purchase | Rs. |
|---|---|---|---|
| honey machines | 3,960.00 | honey machines | 3,960.00 |
| 100 gm. jars stock | 25,296.00 | None | |
| 250 gm. jars stock | 122,121.00 | 250 gm. jars | 120,159.00 |
| 500 gm. jars stock | 132,436.00 | 500 gm. jars | 139,625.00 |
| 1 kg. jars stock | 95,004.00 | 1 kg. jars | 89,270.00 |
| 53 mm. corks stock | 110,548.75 | 53 mm. corks | 68,064.00 |
| 38 mm. corks stock | 8,433.60 | 38 mm. corks | 14,078.00 |

*Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts
may not accept appellate counsel's *post hoc* rationalizations for
agency action . . . . For the courts to substitute their or
counsel's discretion for that of the [agency] is incompatible
with the orderly functioning of the process of judicial review.")
(internal quotation & citation omitted). Therefore, on remand,
Commerce shall explain, with specific reference to the questions
raised in this opinion, its decision not to include expenses for
jars, corks and honey machines in its financial ratio calculation
as direct expenses used for producing finished honey.


II.  Commerce's Decision to Use Export Price for Jinfu PRC's U.S.
     Sales

     In the Final Results, Commerce found that Jinfu PRC and
Jinfu Trading (U.S.A.) Co., Ltd. ("Jinfu USA") were not
"affiliated," within the meaning of 19 U.S.C. § 1677(33)(F),[11]

---

[11]    In pertinent part, the statute provides:

        The following persons shall be considered
        "affiliated" or "affiliated persons": . . .

             (F) Two or more persons directly or
             indirectly controlling, controlled
             by, or under common control with,
             any person. . . .

        For purposes of this paragraph, a person
        shall be considered to control another person
        if the person is legally or operationally in
        a position to exercise restraint or direction
        over the other person.
                                          (continued...)

prior to October 25, 2003.[12]  Issues & Dec. Mem. at 45.[13]  As a

result, Commerce "treated any sales made between Jinfu PRC and

Jinfu USA prior to October 25, 2003, on an [export price] basis,

while all sales made after this date have been treated as

[constructed export price] sales."  *Id.*  Plaintiff Jinfu PRC

disputes Commerce's finding that Jinfu PRC and Jinfu USA were not

affiliated prior to October 25, 2003.  Again, the facts pertinent

to this issue are familiar to the court.  Commerce's finding of

no affiliation with respect to Jinfu PRC is presently the subject

---

[11](...continued)
19 U.S.C. § 1677(33)(F).

[12]     Jinfu USA is the successor company to Yousheng Trading
(U.S.A.) Co., Ltd. ("Yousheng USA"), an import company to which
Jinfu PRC sold its honey during the POR.  *See* Second Supplemental
Questionnaire Resp. of Jinfu PRC, Conf. Doc. 71, Ex. 4(16)
(indicating that on November 8, 2002, Yousheng USA filed an
amendment to its articles of incorporation with the State of
Washington to change its name to Jinfu Trading (U.S.A.) Co.,
Ltd.).

[13]     Commerce's affiliation finding is the subject of *Jinfu
Trading Co. v. United States*, Court No. 04-00597, which is
pending before the court.  For purposes of confidentiality, the
court will employ the same shorthand references it used in *Jinfu
Trading Co. v. United States*, 30 CIT __, Slip Op. 06-137 (Sept.
7, 2006) (not reported in the Federal Supplement) ("*Jinfu I*") and
*Jinfu Trading Co. v. United States*, 31 CIT __, Slip Op. 07-95
(June 13, 2007) (not reported in the Federal Supplement) ("*Jinfu
II*").  Specifically, Jinfu USA's sole employee [[            ]]
is referred to as "Mr. A"; [[              ]], the chairman and
CEO of Jinfu PRC as "CEO B"; [[           ]], the
unaffiliated U.S. buyer as "Customer C"; and [[
]], the original owner of what was then Yousheng USA as "Mr. D."
The attorney retained in October 2002 to aid in the attempted
transfer of ownership of Yousheng USA to CEO B is referred to as
"Attorney E."

of *Jinfu Trading Co. v. United States*, Court No. 04-00597,

familiarity with which is presumed.[14]  In that case, Jinfu PRC

challenges Commerce's rescission of its new shipper review based

on the conclusion that Jinfu PRC was not affiliated with either

Jinfu USA or its predecessor Yousheng Trading (U.S.A.) Co., Ltd.

("Yousheng USA"), within the meaning of 19 U.S.C. § 1677(33)(F)

or (G).  *See* Honey from the PRC, 69 Fed. Reg. 64,029 (Dep't of

Commerce Nov. 3, 2004).  In *Jinfu Trading Co. v. United States*,

30 CIT __, Slip Op. 06-137 (Sept. 7, 2006) (not reported in the

Federal Supplement) ("*Jinfu I*") and *Jinfu Trading Co. v. United

States*, 31 CIT __, Slip Op. 07-95 (June 13, 2007) (not reported

in the Federal Supplement) ("*Jinfu II*"), the court remanded

Commerce's decision to rescind Jinfu PRC's new shipper review.

*See Jinfu I*, 30 CIT at __, Slip Op. 06-137 at 32; *Jinfu II*, 31

CIT at __, Slip Op. 07-95 at 24.  To the extent the issues

presented in this review are identical to those addressed in

*Jinfu I* and *Jinfu II*, the court follows its previous reasoning

and directs the same result.

---

[14]    Plaintiffs contend that the affiliation finding they
challenge here, i.e., Commerce's finding that Jinfu PRC was not
affiliated with either Yousheng USA or Jinfu USA, is the same
finding that formed the basis of Commerce's decision to rescind
the new shipper review.  *See* Pls.' Mem. 33 n.19 ("The
Department's affiliation determination . . . subject to this
Civil Action is a sequel to its Final Determination . . . to
rescind Jinfu's New Shipper Review . . . for the period December
1, 2002 through May 31, 2003.  This rescission determination was
based on the same 'no affiliation' subsidiary determination which
is the subject of the instant Civil Action.").

A.   Affiliation: Ownership Interest

Here, as in *Jinfu I*, plaintiffs argue that Commerce was unreasonable in finding that Jinfu PRC and Jinfu USA were not affiliated because Jinfu PRC owned Jinfu USA starting in October 2002, i.e., a year prior to the execution of the October 25, 2003 ownership transfer agreement between Jinfu PRC's CEO and Jinfu USA's owner.  Pls.' Mem. 36 ("[E]ffective October 25, 2002, [CEO B] acted as if he owned and controlled Jinfu USA.").  Having reviewed the evidence and arguments presented here, the court finds, as it did in *Jinfu I*, that Commerce's conclusion that ownership did not transfer to CEO B prior to October 25, 2003, the date of the ownership transfer agreement between CEO B and Mr. D, is supported by record evidence:

> By [the ownership transfer agreement's] terms, the document provides that: "THIS CERTIFICATE TRANSFER IS EFFECTIVE UPON EXECUTION BY THE UNDERSIGNED."  It is clear, therefore, that the Certificate of Transfer of Shares was not to gain legal effect unless and until the parties signed it.

*Jinfu I*, 30 CIT at __, Slip Op. 06-137 at 23.  The earliest possible effective date of the ownership transfer agreement would be October 25, 2003.[15]  As a result, the court finds, as it did in *Jinfu I*, that it "cannot find as unsupported by substantial

---

[15]   The document is dated October 25, 2003, but it was apparently signed in December of 2003.  *See* Issues & Dec. Mem. at 39 ("Although the purchase of Jinfu USA by [CEO B] occurred some time in December 2003, the parties involved backdated the CTS for that transaction to October 25, 2003.").

evidence Commerce's determination that CEO B did not have sole
ownership of either Yousheng USA or Jinfu USA" prior to October
25, 2003. *Jinfu I*, 30 CIT at __, Slip Op. 06-137 at 25.


   B.   Affiliation: Control

   Next, plaintiffs claim that Jinfu PRC controlled Jinfu USA's
pricing decisions.  This Court has held that Commerce is required
to find affiliation where the party alleging affiliation has
demonstrated that "[t]wo or more entities . . . share various
control relationships whereby one entity is legally or
operationally in a position to exercise restraint or direction
over the other and that such relationship provides one entity the
significant potential for the manipulation of price or production
of the other."  *Hontex Enters., Inc. v. United States*, 29 CIT __,
__, 387 F. Supp. 2d 1353, 1358 (2005) (internal quotation marks &
citations omitted); *see also* 19 U.S.C. § 1677(33) ("[A] person
shall be considered to control another person if the person is
legally or operationally in a position to exercise restraint or
direction over the other person."); 19 C.F.R. § 351.102(b)
(finding of control requires that "the relationship has the
potential to impact decisions concerning the production, pricing,
or cost of the subject merchandise or foreign like product").

   In *Jinfu I*, the court agreed with plaintiffs' claim that the
record evidence indicated that Jinfu PRC controlled Jinfu USA's

pricing decisions and found that "Commerce unreasonably concluded

that [Jinfu PRC and Jinfu USA] were not affiliated." *Jinfu I*, 30

CIT at __, Slip Op. 06-137 at 28.  The court examined the

verification report, which plaintiffs cite here as evidence to

support its argument that CEO B had operational control of Jinfu

USA, as well as correspondence between CEO B and Mr. A and found:

> [I]n the [verification] report, Mr. A
> explains that for transactions where he
> resells honey originally purchased from Jinfu
> PRC, he takes the following steps:
>
>> (1) negotiate material terms of
>> sale with U.S. customer; (2) enter
>> a non-binding sales contract with
>> the U.S. customer; (3) purchase
>> merchandise from Jinfu in the PRC;
>> (4) inform [CEO B] by telephone of
>> finalized . . . material terms of
>> sale and fax him a copy of the
>> sales contract; (5) receive bill of
>> lading, which includes on-board
>> date of the merchandise; (6)
>> receive shipping notification of
>> estimated arrival date; (7) prepare
>> sales invoices for estimated
>> arrival date; and (8) issue invoice
>> to the U.S. customer once the
>> merchandise has cleared FDA.
>
> For the sale in question, Mr. A stated that:
>
>> Subsequent to his negotiations with
>> [Customer C], . . . [Mr. A] faxed a
>> letter to [CEO B] relaying the
>> result of his negotiations . . .
>> and U.S. honey market research.
>> . . . In a reply fax, [CEO B]
>> agreed that the sale with [Customer
>> C] was a good opportunity for Jinfu
>> USA and that the negotiated price
>> was reasonable.  As such, . . .
>> [Mr. A] entered into a sales

contract with [Customer C] . . . .

As a result, the fax sent by Mr. A to CEO B
on November 13, 2002, read as follows:

> Firstly, I would like to report you
> that the current market price of
> honey in the United States is
> between [[      ]] and [[       ]]
> per pound.  Because of the sharp
> reduction of the export of honey
> from other countries, the domestic
> sales and price of honey in the
> United States is very promising.

> I contacted a US local client who
> was willing to order a container of
> honey at the ex-warehouse price of
> [[        ]] USD per ton on the
> condition that it can pass the
> examination of US customs and FDA.
> Since the annual purchasing amount
> of this client is relatively
> significant, if a good relationship
> can be established with this
> client, it will be of great help to
> our company's sales to the US.
> Please let me know you[r] opinion
> and advise me further.

CEO B sent a reply fax on the same day
stating that:

> We received you[r] letter and felt
> happy that there are clients are
> [sic] interested in the honey
> product of our company.  You did a
> good job on the report of the US
> market.  We finished a
> container . . . on November 5.

> In order to open the US market and
> better understand the marketing
> information, I agree with you.  We
> accept the client's quotation of [[
>       ]] USD per ton as ex-
> warehouse price on the condition
> that it passes the examination of

> the US customs and FDA.  Please
> make the preparation and keep in
> touch with the client for purpose
> of long term cooperation.  I hereby
> authorize you to sign contract with
> the client.

*Id*. at __, Slip Op. 06-137 at 28-30 (footnote omitted).  Thus,

the court concluded that the record evidence tended to support

the conclusion that CEO B had operational control of Jinfu USA

and exercised that control with respect to pricing decisions at

the time of the claimed new shipper sale (November 2, 2002).  The

court thus remanded the matter to Commerce.  *Id.* at __, Slip Op.

06-137 at 28, 32; *see TIJID, Inc. v. United States*, 29 CIT __,

__, 366 F. Supp. 2d 1286, 1293 (2005).

On remand, Commerce continued to find that Jinfu PRC was not

affiliated with Jinfu USA or its predecessor Yousheng USA, at the

relevant time, largely because it found the faxes exchanged

between Mr. A and CEO B to be incredible.  *Jinfu II*, 31 CIT at

__, Slip Op. 07-95 at 21.  In addition, Commerce maintained that

"even if considered credible or reliable, [the faxes] merely

indicate that Mr. A found a customer willing to pay X price per

[metric ton] for the honey and that CEO B agreed to this price."

*Id*., Slip Op. 07-95 at 21.  The *Jinfu II* Court found Commerce's

analysis wanting:

> Commerce has not articulated a rational
> connection between its conclusion that CEO B
> did not control Jinfu USA's pricing decisions
> and its statement that the faxes, if valid,
> would not evidence control.  Of particular

>           concern is Commerce's failure to expressly
>           state why CEO B's approval of the sales price
>           and authorization to execute the contract do
>           not evidence control.

*Id.* at __, Slip Op. 07-95 at 22. The Court remanded the matter

to Commerce a second time and directed Commerce to explain "why

the contents of the faxes exchanged between Mr. A and CEO B, if

credible and reliable, do not support a conclusion that CEO B

controlled Jinfu USA," and to "reopen the record to allow

plaintiff to put on the record new evidence regarding the

credibility and reliability of the faxes . . . ." *Id.* at __,

Slip Op. 07-95 at 24.

As in its prior decisions, the court remands this matter to

Commerce. On remand, Commerce is directed to either find that

Jinfu PRC and Jinfu USA were affiliated prior to October 25,

2003, or to provide other record evidence to support its

conclusion that the companies were not affiliated.


CONCLUSION

For the foregoing reasons, the court sustains the Final

Results in part and remands for further action consistent with

this opinion. Remand results are due on December 13, 2007.

Comments to the remand results are due on January 14, 2008.

Court No. 05-00439                                    Page 35

Replies to such comments are due on January 25, 2008.


                                        /s/ Richard K. Eaton
                                          Richard K. Eaton


Dated:    September 13, 2007
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                                   Deputy Clerk