Slip Op. 08-124

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
SHANGHAI ESWELL ENTER. CO.,       :
LTD.; JINFU TRADING CO., LTD.;    :
and ZHEJIANG NATIVE PRODUCE       :
AND ANIMAL BY-PRODUCTS IMPORT     :
& EXPORT GROUP CORP.,             :   Before: Richard K. Eaton, Judge
                                  :
             Plaintiffs,          :   Court No. 05-00439
                                  :
        v.                        :
                                  :
UNITED STATES,                    :
                                  :
             Defendant,           :
                                  :
        and                       :
                                  :
THE AMERICAN HONEY PRODUCERS      :
ASSOCIATION OF AMERICA AND        :
THE SIOUX HONEY ASSOCIATION,      :
                                  :
             Def.-Ints.           :
_____    :
```

OPINION

[United States Department of Commerce's Remand Results are sustained.]

Dated: November 18, 2008

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Ned H. Marshak*, and *Paul G. Figueroa*), for plaintiffs.

*Gregory G. Katsas*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Jane C. Dempsey*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Sapna Sharma*), for defendant.

*Kelley Drye & Warren LLP* (*Michael J. Coursey* and *R. Alan Luberda*), for defendant-intervenors.

Eaton, Judge: In *Shanghai Eswell Enterprise Co., Ltd. v. United States*, 31 CIT __, Slip Op. 07-138 (Sept. 13, 2007) (not reported in the Federal Supplement)("*Shanghai Eswell I*"), this court sustained, in part, and remanded the final results of the United States Department of Commerce's ("Commerce" or the "Department") second administrative review of the antidumping duty order on imports of honey from the People's Republic of China ("PRC") for the period December 1, 2002, to November 30, 2003 ("POR"). *See* Honey from the PRC, 70 Fed. Reg. 38,873, 38,874 (Dep't of Commerce July 6, 2005) ("notice") and the accompanying Issues and Decision Memorandum (June 27, 2005), Pub. Doc. 341 ("Issues & Dec. Mem.") (collectively, "Final Results").

Commerce has now issued the Final Results of Redetermination Pursuant to Court Remand (Dep't of Commerce Feb. 11, 2008) ("Remand Results"). Plaintiffs Shanghai Eswell Enterprise Co., Ltd. ("Shanghai Eswell"), Jinfu Trading Co., Ltd. ("Jinfu PRC"), and Zhejiang Native Produce and Animal By-Products Import & Export Group Corp. ("Zhejiang") (collectively, "plaintiffs") have filed their comments to the Remand Results. *See* Pls.' Comments to Remand Results ("Pls.' Comments"). In addition, Commerce has filed its response to those comments, and defendant-intervenors The American Honey Producers Association of America, Inc. and The Sioux Honey Association (collectively, "defendant-intervenors") have filed their responses, as well. *See* Def.'s Resp. to Pls.'

Court No. 05-00439                                            Page 3

Comments ("Def.'s Resp."); Def.-Ints.' Resp. to Pls.' Comments

("Def.-Ints.' Resp.").  Jurisdiction is had pursuant to 28 U.S.C.

§ 1581(c)(2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii)(2000).  For

the reasons set forth below, the Remand Results are sustained.


                         STANDARD OF REVIEW

     The court reviews Commerce's Remand Results under the

substantial evidence standard:  "The court shall hold unlawful

any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

not in accordance with law. . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).


                            DISCUSSION

I.  Normal Value

     In antidumping investigations, Commerce must determine

whether merchandise is sold, or is likely to be sold, at less

than fair value by making "a fair comparison . . . between the

export price,[1] or constructed export price[2] and normal value."

_____

          [1]    The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted.  19
U.S.C. § 1677a(a).

          [2]    "Constructed export price" is "the price at which the
subject merchandise is first sold . . . in the United States . .
. by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or

19 U.S.C. § 1677b(a).  In cases where the subject merchandise

originates from a non-market economy ("NME")[3] country, such as

the PRC, Commerce usually determines normal value by employing

surrogate data to value the factors of production used to produce

the merchandise.  *See* 19 U.S.C. § 1677b(c)(1).  The Department

then adds "an amount for general expenses and profit plus the

cost of containers, coverings and other expenses."  *Id.*


    A.   Valuation of Factors of Production: Raw Honey

    In its Final Results, Commerce relied on Indian data from

the website maintained by EDA Rural Systems Pvt. Ltd. ("EDA") to

calculate the value of raw honey.[4]  In response, plaintiffs

---

exporter, to a purchaser not affiliated with the producer or
exporter," as adjusted.  19 U.S.C. § 1677a(b).

    [3]    A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, because the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate
data from India.  *See* 19 U.S.C. § 1677b(c)(4).

    [4]    Commerce explained: "In selecting the EDA Data, the
Department determines that the raw honey pricing data in this
article is the best information currently available because it is
publicly available, quality data, specific to the raw honey

(continued...)

contended that Commerce had not adequately considered evidence of

a decline in honey prices during the second half of the POR and

cited data from the World Trade Atlas ("WTA") as evidence of this

decline. *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 8;

*see* Pls.' Comments at 2-5.

In *Shanghai Eswell I*, the court found merit in plaintiffs'

arguments. *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at

9-10.  Thus, the court directed Commerce to

> either (1) address the evidence cited by
> plaintiffs and explain whether and how the
> observed decline in prices during the second
> half of the POR is reflected in its
> calculation of the value of raw honey; or (2)
> recalculate the value to reflect a reasonable
> interpretation of the record evidence
> concerning the decline.

*Id*. at __, Slip Op. 07-138 at 11.

On remand, Commerce addressed the evidence of a price

decline offered by plaintiffs: 1) the WTA data; and 2) three

additional sources, specifically, two news articles and the

statements of a journalist.


1.   World Trade Atlas Data

On remand, Commerce claims that it did not use the WTA data

offered by plaintiffs for two reasons: (1) because "the WTA

_____

[4](...continued)
beekeeping industry in India, and contemporaneous with the POR."
Issues & Dec. Mem. at 10.

export data represent export prices from India to other

countries," and that this data does not necessarily "accurately

reflect the market value of the goods within the country of

exportation"; and (2) because the Harmonized Tariff heading

("HTS")[5] on which the WTA data is based is a "basket category"

that may include merchandise other than raw honey.  Remand

Results at 5-6.

As to the use of export data, Commerce insists that the WTA

data, and export data generally, are not "a reliable source for

valuing inputs or serving as an indicator of internal pricing

trends because [Commerce] could not ascertain whether export

prices reflected or mirrored the domestic prices of honey in the

marketplace."  Def.'s Comments 3 (citations omitted).  Thus, the

Department would have "no way of knowing if export prices mimic

---

[5]     The heading upon which the WTA data is based, HTS
0409.00.00 is described as "natural honey" in the Harmonized
Tariff Schedule of the United States ("HTSUS").  *See* HTSUS, USITC
Pub. 3477, sec. 1, ch. 4, at 35 (2002).  HTSUS is a listing of
classifications of all goods imported into the United States and
the accompanying duties on those imports.

The Explanatory Notes to this heading describe it as covering
"honey produced by bees (*Apis mellifera*) or by other insects,
centrifuged, or in the comb or containing comb chunks, provided
that neither sugar nor any other substance has been added.  Such
honey may be designated by floral source, origin or color."
Harmonized System Explanatory Notes 04.09 (2d ed. 1996).  The
court notes that, while the explanatory notes are not legally
binding, they are persuasive and considered "generally indicative
of the proper interpretation of a tariff provision."  *Drygel,
Inc. v. United States*, 541 F. 3d 1129, 1134 (Fed. Cir.
2008)(citations and quotation omitted).

or even reflect domestic prices in the marketplace." Remand Results at 5. In other words, Commerce does not find the WTA data to be the best available information[6] because, unlike the EDA data, there is no evidence on the record demonstrating that the WTA data reflect domestic prices.

In their comments, plaintiffs do not directly address Commerce's claim that record evidence does not support the conclusion that export prices necessarily reflect domestic prices. Rather, plaintiffs insist that Commerce's argument that export prices are not reliable as a source for valuing domestic inputs is "reversible legal error" because it "summarily rejects declining export prices as evidence that Indian raw honey prices declined during the [POR]." Pls.' Comments 4.[7]

_____

[6]     In choosing surrogate values, Commerce is directed to value the factors of production based on "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1).

[7]     In addition, plaintiffs contend that the Department's claim that export prices do not necessarily reflect domestic prices has been "effectively overruled" by *Fuyao Glass Indus. Group Co. v. United States*, 27 Int'l Trade Rep. (BNA) 1328 (Ct. Int'l Trade 2005) ("*Fuyao*") which rejected the Department's position that export prices were unreliable based solely upon speculation that subsidies may have affected these prices. Pls.' Comments 3.

Contrary to plaintiff's argument, however, *Fuyao* is inapplicable in this case because Commerce did not decline to use the WTA export data based on a suspicion of export subsidies. Rather, Commerce explicitly stated that the WTA export data "may not accurately reflect the market value of the goods within the

(continued...)

With respect to the HTS heading upon which the WTA data is based, Commerce finds that even if it were to

> accept export data in this instance for purposes of evaluating domestic pricing trends, we do not find the WTA export data to constitute an acceptable source for such because the category of merchandise covered by the data is much broader than the merchandise covered by the scope of the order.

Remand Results at 6.  To support this position, Commerce claims that the WTA export data is based upon an HTS heading that "includes exports of both raw honey and processed honey, and may include specialty forms of honey in jars, bottles, etc."  Remand Results at 6.  That this category of merchandise includes processed honey is not contested, and plaintiffs specifically note in their comments that the record contained "data for over 70 percent of Subheading[8] [0409.00.00] merchandise . . . which revealed that these exports consisted of processed and filtered honey packaged in drums."  Pls.' Comments 4 (footnote omitted).

As Commerce notes, because a basket category may not reflect prices solely of subject merchandise "[w]hen valuing respondents' factors of production ("FOPs") the Department prefers product specific tariff classifications rather than basket tariff provisions, unless there is no other available information."

---

[7](...continued)
country of exportation."  Remand Results at 5.

[8]     Plaintiffs refer to heading 0409.00.00 as a subheading.

Remand Results at 6 (citations omitted).  As a result, Commerce

does not find the WTA data to be the best available information

to value raw honey, particularly because the record contains the

EDA data which reflects the price solely of raw honey, the

subject of the review.  Accordingly, on remand the Department

does not consider the evidence derived from the WTA export data

as probative of a decline in raw honey prices during the latter

half of the POR.

Plaintiffs sole argument in response is that "[t]he

Department's belief that the HTS category [used in the WTA data]

is 'broad and expansive' is simply wrong.  Subheading

[0409.00.00] is not a 'basket' HTS subheading encompassing

multiple products.  It is limited to honey – the precise product

subject to this investigation."  Pls.' Comments 4 (citation

omitted).

The court sustains Commerce's findings and holds that

Commerce supports with substantial evidence its reasons for

excluding the WTA data.  First, Commerce fully explains the basis

for its decision not to rely on the WTA data as evidence of a

decline in honey prices.  Specifically, the Department explains

that the WTA data represents export data, and that being the

case, Commerce has no way of determining if this export data

reflects domestic prices.  Put another way, there is no evidence

on the record showing that the WTA data reflects domestic prices,

in contrast to the EDA data which does reflect domestic pricing.
The court therefore finds that the Department's decision to
exclude the WTA data in favor of the EDA data was reasonable and
supported by substantial evidence.  *See Shakeproof Assembly
Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT
479, 481, 59 F. Supp. 2d 1354, 1357 (1999) ("The statute requires
Commerce to use the best available information, but does not
define that term . . . . If Congress had desired to restrict the
material on which Commerce could rely, it would have defined the
best available information.") (footnote and citation omitted).

　　　Second, Commerce explains that, in addition, it did not use
the WTA data because they are for a broad category of honey
products, not just raw honey, and thus may not accurately
represent prices for raw honey.  Plaintiffs do not address how
the price for this HTS heading, which includes both processed and
raw honey, is calculated.  More to the point, plaintiffs fail to
explain if and how the data for export prices under HTS
0409.00.00 were affected (i.e., skewed upward) by the inclusion
of processed honey in this category.  Accordingly, this
information cited by plaintiffs does not constitute substantial
evidence of a price decline during the second half of the POR.

     2.   Other Evidence Regarding Price Decline

     On remand, in reaching its determination on surrogate value,
Commerce chose not to use evidence from three additional sources
that plaintiffs put on the record in the administrative review to
support their argument that the WTA data reflected a price
decline during the second half of the POR.  These three sources
are: (1) "Honey Sweet Despite Price Fall," published by the
Tribune of India on December 15, 2003, giving a range of honey
prices for 2003 as between 105 and 65 rupees ("Tribune article");
(2) statements by the author of the Tribune article who advised
Commerce that in September 2003, honey prices were between 45 and
75 rupees ("prices from the journalist"); and (3) "Prospects of
Bee Keeping in Rubber Plantations of Kerala," from Indiainfoline,
giving the range of honey prices in September 2003 as between 40
and 42 rupees ("Indiainfoline article").[9]  Def.'s Comments 6 n.
1; *see also* Pls.' Comments 5.

     As stated, on remand Commerce was instructed to explain how
plaintiffs' proffered evidence of a price decline was taken into
account in the Final Results.  Commerce explains in the Remand
Results that, because the WTA export data primarily relied upon
by plaintiffs did not demonstrate the alleged decline in raw

_____

     [9]   Indiainfoline is a financial services company focused
on industry in India.  Among other things, it provides research
and content for brokerage, commodities, mutual fund and portfolio
management services businesses. *See* Indiainfoline,
http://www.indiainfoline.com (last visited Nov. 18, 2008).

honey prices within India, it had not "specifically addressed"
three other sources offered by plaintiff as further evidence of a
price decline in the Final Results.  *See* Def.'s Comments 6;
Remand Results at 23.  On remand, Commerce has addressed
arguments made by defendant-intervenors on remand regarding the
additional sources, outlining its reasons for rejecting the
evidence from these three sources.  Plaintiffs claim that,
nonetheless, the Department has still "failed to explain the
basis of its decision" to exclude this material.  Pls.' Comment
6.

     Despite plaintiffs' claim, the court finds that the
Department has now given a sufficient explanation for rejecting
the additional sources.  In reaching its determination on remand,
Commerce states, "the evidence contained in these two articles
and the prices from the journalist fail to demonstrate that raw
honey prices fell during the second half of the POR, or that our
calculation methodology resulted in an inappropriate surrogate
value for raw honey."  Remand Results at 23.

     First, Commerce states that the surrogate value for raw
honey (74.9 rupees) "fell within the range of prices reported in
the Tribune article [from 105 rupees to 65 rupees] and provided
by the journalist [from 75 rupees to 45 rupees]," such that these
sources "did not undermine Commerce's decision not to take into
account WTA export data or rejecting the use of the information

in adjusting or determining the surrogate data." Def.'s Comments

6 (citing Remand Results at 22). An examination of these sources

reveals that Commerce is correct in making these statements, and

thus these two sources do not provide substantial evidence for

plaintiffs' claim of a price decline.

In addition, Commerce correctly notes that this court has

previously determined that the Indiainfoline article "was an

unreliable source for surrogate value data." Def.'s Comments 7

(citing Remand Results at 22; *Shanghai Eswell I*, 31 CIT at __,

Slip Op. 07-138 at 7-8 (finding "the *Indiainfoline* article

contained nothing to indicate it was reliable. In particular,

there was 'no additional information on the author's

qualifications or the sources of his information' other than his

status as a first-year business student.") (quoting *Wuhan Bee*

*Healthy Co. v. United States*, 31 CIT __, __, Slip Op. 07-113 at

32-33 (July 20, 2007) (not reported in the Federal Supplement)

("*Wuhan I*")). Consequently, the Department maintains that "this

evidence fails to substantiate plaintiffs' argument that the

surrogate honey price chosen by the Department was incorrect."

Remand Results at 23 (citation omitted). The court finds no

reason to depart from this Court's previous holding that the

Indiainfoline article is unreliable.

Thus, plaintiffs' argument that Commerce on remand

"summarily rejected" the additional sources is unfounded. *See*

*Wuhan Bee Healthy Co. v. United States*, 32 CIT __, __, Slip Op.
08-61 at 8 (May 29, 2008) (not reported in the Federal
Supplement) ("*Wuhan II*") (citing *United Steel, Paper and
Forestry, Rubber, Manufac., Energy, Allied Industr. and Service
Workers Int'l Union v. United States Sec'y of Labor,* 32 CIT __,
__, Slip Op. 08-45 at 7 (Apr. 30, 2008) ("A fundamental
requirement of administrative law is that an agency set forth its
reasons for decision.") (quotation and citation omitted)). Based
on the foregoing analysis, the court holds that Commerce's
surrogate value determination for the factor of production raw
honey is sustained.


   B.  Calculation of Surrogate Financial Ratios

   Title 19 U.S.C. § 1677b (c)(1)(B) requires that the
calculation of normal value include amounts for "general expenses
and profit." Accordingly, Commerce "usually calculates" separate
values for: (1) selling, general and administrative ("SG&A")
expenses; (2) manufacturing overhead; and (3) profit, using
ratios derived from financial statements of companies that
produce identical or comparable merchandise in the surrogate
country. *Wuhan I*, 31 CIT at __, Slip Op. 07-113 at 41-42
(citation and quotation omitted).

   In *Shanghai Eswell I*, the court affirmed the Department's
reliance on data from Mahabaleshwar Honey Producers Cooperative

Society, Ltd.'s ("MHPC") financial statement as the "best

available information" for calculating surrogate financial

ratios. *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 12.

The court, however, remanded for further explanation (1)

Commerce's decision to include honey sales commissions in its

calculation of selling, general and administrative expenses

("SG&A"),[10] rather than using them to make an adjustment to

constructed value, and (2) Commerce's failure to treat MHPC's

expenses for jars, corks and honey machine purchases as direct

materials. *Id.* at __, Slip Op. 07-138 at 20, 26.


        (1) Honey Sales Commissions

        In its Final Results, Commerce determined that the honey

sales commissions found on the MHPC financial statements should

---

[10]     As this Court explained in *Shanghai Foreign Trade*:

[t]o calculate the SG&A ratio, the Commerce practice is
to divide a surrogate company's SG&A costs by its total
cost of manufacturing.  For the manufacturing overhead
ratio, Commerce typically divides total manufacturing
overhead expenses by total direct manufacturing
expenses.  Finally, to determine a surrogate ratio for
profit, Commerce divides before-tax profit by the sum
of direct expenses, manufacturing overhead and SG & A
expenses.  These ratios are converted to percentages
("rates") and multiplied by the surrogate values
assigned by Commerce for the direct expenses,
manufacturing overhead and SG & A expenses.

*Shanghai Foreign Trade Enters. Co. v. United States,* 28 CT 480,
482, 318 F. Supp. 2d 1339, 1341 (2004) (citations omitted).

be included in the calculation of the surrogate SG&A ratio as standard selling expenses.[11]

The court in *Shanghai Eswell I* held that Commerce had not addressed plaintiffs' argument that in this case sufficient record evidence existed of an "exact correlation" between Shanghai Eswell's, Zhejiang's, and the surrogate producer's expenses to enable Commerce to make a circumstances-of-sale ("COS") adjustment, and that remand was thus appropriate. *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 21. The court remanded this issue to Commerce to explain in more detail its determination that the record evidence was insufficient to permit a COS adjustment in this case. *Id.* On remand, Commerce continues to find that "honey sales commissions should be included in the surrogate SG&A calculation," primarily because

---

[11]    Under Commerce's regulations, "direct selling expenses" include "commissions . . . that result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(c)(2008). In a market economy proceeding, Commerce is required to make a "circumstances-of-sale" adjustment to (A) either export price or constructed export price; and (B) normal value to account for differences in direct selling expenses incurred in the United States and foreign markets. *See* 19 U.S.C. § 1677a(d)(1)(A) (providing for the reduction in the price used to establish constructed export price by the amount of any commissions for selling the subject merchandise in the United States); 19 U.S.C. § 1677b(a)(6)(C)(iii) (providing for adjustment to normal value for differences in circumstances of sale). The purpose of the adjustment is to ensure that export price and normal value are being compared on an "equivalent basis" when Commerce makes its dumping determination. *See* Imp. Admin. Antidumping Manual, Ch. 8 at 16 (Jan. 22, 1998) (available at http://www.ia.ita.doc.gov).

there is not sufficient evidence of an "exact correlation"
between Shanghai Eswell's, Zhejiang's, and the surrogate
producer's expenses.  Remand Results at 9.

For their part, plaintiffs claim that "the commission
expenses incurred by Shanghai Eswell and Zhejiang parallel the
expenses incurred by MHPC [the surrogate producer]."  Pls.'
Comments 7.  Plaintiffs argue that "MHPC incurs selling
commissions in its home market sales, which mirror exactly the
honey sale commission expense incurred by plaintiffs in their
sales in the U.S. market."  *Id*.

Commerce, however, disagrees.  It states:

> record evidence cited by plaintiffs reveals
> that neither Shanghai Eswell, nor Zhejiang,
> paid commissions on sales in the United
> States as the exporter.  Rather, the
> commissions paid on U.S. sales were paid in
> the United States by Shanghai Eswell's and
> Zhejiang's U.S. affiliates.

Remand Results at 10 (citations omitted).  By way of contrast,
"MHPC's financial statement does not contain activity for
overseas affiliates; therefore, it is reasonable to conclude that
the commissions reflected on MHPC's financial statement were
incurred and paid by MHPC itself within India."  *Id*.
Accordingly, Commerce finds that "an exact correlation did not
exist with respect to commissions between Shanghai Eswell,
Zhejiang, and the surrogate producer."  Def.'s Comments 8.

The court finds that Commerce has provided a sufficient

explanation, supported by substantial evidence, for its decision
not to make a COS adjustment for commissions indicated on MHPC's
financial statement.  The record evidence does not demonstrate
that an exact correlation existed between the commissions paid by
Shanghai Eswell, Zhejiang, and the surrogate producer.  This is
because the surrogate producer's financial statement does not
contain entries relating to activity for overseas activity.
Thus, it is fair to assume that any commissions paid were for
home market sales.  The commissions cited by Shanghai Eswell and
Zhejiang on the other hand, were paid in the United States by
their affiliates.  Therefore, the record does not support with
substantial evidence a finding of an "exact correlation" between
the MHPC financials and plaintiffs' actual experience.  Beyond
claiming that an exact correlation exists, plaintiffs have not
pointed to any evidence to substantiate their claim.  Thus, the
Department's findings as to its inclusion of honey sales
commissions are sustained.


           (2) Jars, Corks and Honey Machine Purchases

     In its Final Results, Commerce did not include MHPC's
expenses for (1) jars and corks and (2) honey machines in its
financial ratio calculation.  *See* Issues & Dec. Mem. at 23;
*Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 22.  Commerce
explained that its decision not to include these expenses was

justified because these expenses "appear separately in both the
'Sales' and 'Purchase' columns, independent of the 'Honey
Collection' and 'Honey Sale' line items . . . ."  Issues & Dec.
Mem. at 23.

In *Shanghai Eswell I*, the court noted that the chart of
these expenses in the MHPC financial statement, upon which
Commerce relied, "specifically pertains to honey sale and
collection" and that there was no evidence to support a
conclusion that the jars were used for anything other than
containers for honey.  31 CIT at __, Slip Op. 07-138 at 24-25.
As for the honey machines, the court found Commerce's conclusion
that honey machines are a "productive asset" to be inadequately
explained.  *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at
25.  The court therefore remanded these issues and instructed
Commerce to further explain its decision not to include expenses
for jars, corks and honey machines in its financial ratio
calculation as direct expenses for producing finished honey.  *Id.*
at __, Slip Op. 07-138 at 26.

As to jars and corks, on remand Commerce reconsiders its
treatment of expenses for jars and corks and revises its
financial ratios to include these expenses as direct material
costs.  Remand Results at 15.  With respect to honey machines,
Commerce continues to find that they are a productive asset and
therefore do not constitute a direct expense to be included in

its financial ratio calculation.  *Id.* at 16.

As to the honey machines, the Department explains that, in
accordance with generally accepted accounting principles
("GAAP"), "[p]roductive assets are defined as tangible property
to be used in a productive capacity that will benefit the
enterprise for greater than one year" and that the purchase of
productive assets do not result in a direct expense.  *Id.*  In
addition, Commerce notes, honey machines are independently
itemized on MHPC's financial statement. *Id.* at 16.  Accordingly,
the Department finds that they are properly treated as a
productive asset to be depreciated, rather than as a direct input
to be expensed.  *Id.*

It is worth noting that plaintiffs have not commented on the
Department's Remand Results with respect to jars, corks or honey
machines.  Accordingly, Commerce "may well be entitled to assume
that the silent party has decided, on reflection, that it concurs
in the agency's [remand results], and the court will uphold the
parties' concurrence." *Wuhan II*, 32 CIT at __, Slip Op. 08-61 at
12 (quotation and citation omitted).

The court sustains the Department's findings regarding the
treatment of jars, corks, and honey machines, as there is
substantial evidence on the record supporting its conclusions.
*See Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399,
404-05, 636 F. Supp. 961, 966 (1986).  The decision to include

expenses for jars and corks in the financial ratios is supported
by a) the MHPC statement which "specifically pertains to honey
sale and collection," and b) the lack of evidence to support a
conclusion that the jars were used for anything other than as
containers for finished honey.  *See Shanghai Eswell I*, 31 CIT at
__, Slip Op. 07-138 at 24-25.

     The court also finds that the Department's explanation for
choosing to treat the honey machines as productive assets rather
than direct expenses is reasonable and supported by substantial
evidence.  Specifically, honey machines fit the GAAP designation
of productive assets and are separately itemized on MHPC's
financial statement.  As a result, Commerce was correct to treat
them as a capital asset subject to depreciation rather than an
input to be expensed.  The Remand Results are sustained with
respect to the treatment of these expenses.


II.  Commerce's Decision to Use Export Price for Jinfu PRC's
     United States Sales

     In the Final Results, Commerce found that, prior to October
25, 2003, the date of the transfer document ("Certificate of
Transfer of Shares"), Jinfu PRC and Jinfu Trading (U.S.A.) Co.,
Ltd. ("Jinfu USA")[12] were not under common ownership or otherwise

---

     [12]     As explained in *Shanghai Eswell I*, Jinfu USA is the
(continued...)

"affiliated," within the meaning of 19 U.S.C. § 1677(33)(F).[13]

*See* Issues & Dec. Mem. at 45.  Because of this finding, Commerce

"treated any sales made between Jinfu PRC and Jinfu USA prior to

October 25, 2003, on an [export price] basis, while all sales

made after this date have been treated as [constructed export

price] sales."  Issues & Dec. Mem. at 45 (citations omitted).

        In *Shanghai Eswell I*, the court sustained the Department's

determination that CEO B,[14] the chairman and CEO of Jinfu PRC, did

---

[12](...continued)
successor company to Yousheng Trading (U.S.A.) Co., Ltd.
("Yousheng USA"), a company to which Jinfu PRC sold its honey
during the POR.  On November 8, 2002, Yousheng USA filed an
amendment to its articles of incorporation changing its name to
Jinfu Trading (U.S.A) Co., Ltd. 31 CIT at ___, Slip Op. 07-138 at
27 n. 12.

[13]        In pertinent part, the statute provides:

            The following persons shall be considered "affiliated"
            or "affiliated persons":

                (F) Two or more persons directly or
                indirectly controlling, controlled by,
                or under common control with, any person
                . . . .

            For purposes of this paragraph, a person shall be
            considered to control another person if the person
            is legally or operationally in a position to
            exercise restraint or direction over the other
            person.

19 U.S.C. § 1677(33)(F).

[14]        As in *Shanghai Eswell I*, the court will apply the same
shorthand that it used most recently in *Jinfu Trading Co. v.
United States*, 32 CIT  ___, Slip Op. 08-38 (Apr. 4, 2008) (not
reported in the Federal Supplement).  31 CIT at ___, Slip Op. 07-
                                                    (continued...)

not own Jinfu USA prior to October 25, 2003.[15]  *Shanghai Eswell I*,

31 CIT at __, Slip Op. 07-138 at 29-30.  The court, however, also

found that Commerce had failed to provide a sufficient

explanation for its determination on affiliation (which does not

necessarily entail ownership) and remanded this matter to

Commerce.  *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at

34.

In accordance with the court's remand instructions, Commerce

reexamined the record evidence.  On remand, it continues to find

---

[14](...continued)
138 at 27 n. 13.  Specifically, Jinfu USA's sole employee is
referred to as "Mr. A"; the chairman and CEO of Jinfu PRC is
referred to as "CEO B"; and the original owner of Yousheng USA is
referred to as "Mr. D".  *Id.*

[15]     The *Shanghai Eswell I* court based its determination on
the Certificate of Transfer of Shares executed between CEO B and
Mr. D.  The document provides, by its terms, that "This
certificate transfer is effective upon execution by the
undersigned," and accordingly, that the document was not to gain
legal effect unless and until the parties signed it.  *Shanghai
Eswell I*, 31 CIT __, Slip Op. 07-138 at 29 (citation omitted).
Moreover, despite the document being dated October 25, 2003, it
was apparently signed in December of 2003, and the parties
involved backdated the document to October 25, 2003.  *Id.* at __,
Slip Op. 07-138 at 29 n. 15.  Thus, the court found:

> [t]he earliest possible effective date of the
> ownership transfer agreement would be October
> 25, 2003.  As a result, the court finds, as
> it did in *Jinfu I*, that it cannot find as
> unsupported by substantial evidence
> Commerce's determination that CEO B did not
> have sole ownership of either Yousheng USA or
> Jinfu USA prior to October 25, 2003.

*Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 29-30
(footnote, quotation and citations omitted).

that the companies were not affiliated prior to October 25, 2003.

Remand Results at 18.  Plaintiffs argue that this remand

determination is unsupported by substantial evidence.  In

addition, plaintiffs contend that, in light of a recent United

States Court of Appeals for the Federal Circuit decision, the

court should revisit Commerce's determination that the Chairman

and CEO of Jinfu PRC did not own Jinfu USA prior to October 25,

2003.


    A.    Commerce's Determination That Jinfu PRC and Jinfu USA
          Were Not Affiliated Until October 25, 2003

    Plaintiffs claim that they have demonstrated that Jinfu PRC

and Jinfu USA were affiliated "during POR 2 [December 1, 2002

through November 30, 2003]".  Pls.' Comments 11, 17.  This Court

has held that Commerce is required to find affiliation where the

party alleging affiliation has demonstrated that "[t]wo or more

entities . . . share various control relationships whereby one

entity is legally or operationally in a position to exercise

restraint or direction over the other and that such relationship

provides one entity the significant potential for the

manipulation of price or production of the other."  *Hontex*

*Enters., Inc. v. United States*, 29 CIT 1096, 1101, 387 F. Supp.

2d 1353, 1358 (2005) (quotation and citation omitted); *see also*

19 U.S.C. § 1677(33) ("[A] person shall be considered to control

another person if the person is legally or operationally in a

position to exercise restraint or direction over the other

person."); 19 C.F.R. § 351.102(b)(3) (finding of control requires

that "the relationship has the potential to impact decisions

concerning the production, pricing, or cost of the subject

merchandise or foreign like product").

The facts surrounding the affiliation of the two companies

have been the subject of earlier litigation in this Court.  In

*Jinfu Trading Co. v. United States*, 32 CIT __, Slip Op. 08-38

(Apr. 4, 2008) (not reported in the Federal Supplement) ("*Jinfu

III*"), the Court sustained Commerce's finding that Jinfu PRC was

not affiliated with Jinfu USA on or before November 2, 2002.

Having reviewed *Jinfu III* and having considered the parties

arguments, the court adopts the holding in *Jinfu III* and finds

that Jinfu PRC and Jinfu USA were not affiliated prior to

November 2, 2002.

Plaintiffs contend that, regardless of the Court's ruling in

*Jinfu III* finding no affiliation during the new shipper review at

issue in that case, Commerce's affiliation findings in this case

are not supported by substantial evidence.  Specifically,

plaintiffs argue that record evidence exists to support a finding

that CEO B controlled Jinfu USA prior to the October 25, 2003

Certificate of Transfer of Shares.  *See* Pls.' Comments 12-14.

Plaintiffs argue that evidence of events occurring after November

2, 2002 demonstrates that the two companies were affiliated after

that date but prior to October 25, 2003.  First, plaintiffs

insist that "Mr. A expressly named CEO B as Jinfu USA's President

in [an annual report] he filed with the State of Washington on

March 12, 2003."  Pls.' Comments 13 (citations omitted).  Second,

plaintiffs state that "CEO B was also named as Jinfu USA's

President and owner in documents filed with the Internal Revenue

Service and Customs Service."  Pls.' Comments 13.  Finally,

plaintiffs contend that certain sale-specific documents were

signed by CEO B on behalf of Jinfu USA "in his capacity as

President of that company."  Pls.' Comments 13 (citing Jinfu

Supplemental Section D Response (May 17, 2004), Administrative

Record ("AR") Doc. 4[7] at Ex. 2 (Human Consumption Certificate

dated Aug. 19, 2003; Certificate of Non-Reimbursement of

Antidumping Duties dated Aug. 19, 2003)).

    In response, Commerce states that the documents submitted by

Jinfu PRC, taken as a whole, do not constitute substantial

evidence that the two companies were affiliated prior to October

25, 2003.  In addition, Commerce cites one post-November 2, 2002

document to support its case:

> Jinfu USA's Master License Application, filed
> with King County, Washington on November 18,
> 2002, was signed by Jinfu USA's sole
> employee.  We note that under the "Purpose of
> Application" section, which instructs the
> applicant to "Please check all boxes that
> apply," the only checked box is "Open/Reopen
> Business."  The next box, "Change Ownership,"
> is left blank.  In addition, under "List all
> owners: Sole proprietor, partners, officers,

>and LLC members," Jinfu USA's sole employee
>only lists himself as the secretary. There
>is no mention of any owner of Jinfu USA,
>other than this employee asserting that he is
>the owner.

Remand Results at 29 (citing Final Results at Comment 8). As to

the Master License Application, the court finds, and plaintiffs

do not dispute, that this document is substantial evidence that

no change with respect to affiliation occurred after November 2,

2002 and before November 18, 2002.

With respect to the documents cited by plaintiffs as

evidence that CEO B controlled Jinfu USA during the POR, the

court first turns to the March 12, 2003 submission to the state

of Washington. This one page annual report does indeed name CEO

B as president of Jinfu USA and was signed by Mr. A.

Nonetheless, this document, by itself, does not demonstrate

ownership of Jinfu USA by CEO B. As the court has previously

held, the earliest that the transfer of ownership could be found

is October 25, 2003, the date of the Certificate of Transfer of

Shares. *See Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at

29-30 (The document provides, by its terms, that "'This

certificate transfer is effective upon execution by the

undersigned.' It is clear, therefore, that the Certificate of

Transfer of Shares was not to gain legal effect unless and until

the parties signed it." *Shanghai Eswell I*, 31 CIT at __, Slip

Op. 07-138 at 29 (citation omitted)).

Moreover, the March 12, 2003 document is scant evidence that CEO B was in a position to exercise actual or potential control over Jinfu USA.  That is, because the overwhelming evidence up to this point has been that Mr. A operated Jinfu USA independent of CEO B's control (*see Jinfu III*, 32 CIT at ___, Slip Op. 08-38 at 15), Commerce is acting within its discretion in finding the bare representation in the March 12 document that CEO B was president of Jinfu USA is not by itself dispositive.  In other words, because the evidence to this point has been that Mr. A had sole operational control of Jinfu USA, the March 12 document cannot be said to be substantial evidence that the state of affairs had changed.  This is because there is nothing in the document demonstrating that CEO B was in a position to impact Jinfu USA's "price or cost" decisions.  *See U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) ("It is the [Department's] task to evaluate the evidence it collects during its investigation.").

Next, plaintiffs point to documents allegedly prepared for the Internal Revenue Service in which CEO B was named as Jinfu USA's President and owner.  With regard to these documents, this Court has previously found, in *Jinfu Trading Co. v. United States*, 30 CIT ___, Slip Op. 06-137 (Sept. 7, 2006) (not reported in the Federal Supplement) ("*Jinfu I*"), that the 2002 tax return "was unsigned, and [it] was unclear whether it was ever filed."

Def.'s Comments 13; *see Jinfu I*, 30 CIT at __, Slip Op. 06-137 at

24.  Thus, these papers are of little probative value.  *See Jinfu

I*, 30 CIT at __, Slip Op. 06-137 at 24.

Regarding the sale-specific documents signed by CEO B on

behalf of Jinfu USA, these documents designate Jinfu PRC and

Jinfu USA as "related" companies "on entry summaries filed with

Customs for each shipment," and two of these documents (the Human

Consumption Certificate dated Aug. 19, 2003 and the Certificate

of Non-Reimbursement of Antidumping Duties dated Aug. 19, 2003),

were signed by CEO B on behalf of Jinfu USA "in his capacity as

President of that company."  Pls.' Comments 13 (citation

omitted).  These documents, filed with Customs and regarding a

sale, also do not overcome the evidence of the Certificate of

Transfer of Shares, nor do they indicate the level of control

necessary to show affiliation.  In particular, neither of these

documents evidence any control, on CEO B's part, over costs or

pricing of the products Jinfu USA handles.

Here, Commerce specifically discussed and addressed

plaintiffs' proffered evidence and found it unpersuasive.

Commerce must assess the weight to be assigned to specific

evidence.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345,

1350 (Fed. Cir. 2006).  Having reviewed Commerce's explanation,

the court finds that Commerce's determination that Jinfu PRC was

not affiliated with Jinfu USA prior to October 25, 2003 is

supported by substantial evidence.


      B.    Commerce's Determination That CEO B Did Not Have
            Ownership of Jinfu USA Prior to October 25, 2003

     Plaintiffs argue that this court's prior decision that CEO B

did not have ownership of Jinfu USA before October 25, 2003 must

be revisited and reversed.  As discussed above, in *Shanghai

Eswell I*, the court affirmed the Department's determination that

CEO B did not have ownership of Jinfu USA prior to October 25,

2003 based on the execution of the Certificate of Transfer of

Shares.  *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 29-

30.  Plaintiffs now claim that the recent Federal Circuit

decision in *Crawfish Processors Alliance v. United States*, 477 F.

3d 1375 (2007) ("*Crawfish Processors*"), requires the court to

reverse its previous decision because the Federal Circuit has

rejected certain evidence upon which the court relied as not

required to prove affiliation.  *See* Pls.' Comments 18.

     In *Crawfish Processors*, the company claiming ownership

purchased stock in the other entity using a promissory note

committing the purchaser to pay the purchase price, in

merchandise, over a period of time.  *See Crawfish Processors*, 477

F.3d at 1378.  Commerce rejected the purchaser's affiliation

claim, asserting that 19 U.S.C. § 1677(33) requires that a

"transfer of cash or merchandise" be fully effectuated within the

period of review in order to demonstrate ownership, and that

because payment in full was not made during the period of review

the transfer did not occur. *See id.* at 1380-81.  The Federal

Circuit rejected Commerce's requirement that payment be made

within the period of review, stating that "[t]he statute imposes

no time requirement on financial transactions showing

affiliation." *Id.* at 1381.  In other words, because the

documents transferring title were executed, and a promissory note

was delivered, during the period of review, these alone were

sufficient to put ownership of both companies in one place.

Plaintiffs argue that because the court's previous ruling on

the question of ownership was based, in part, on CEO B's failure

to pay for his interest in Jinfu USA until more than one year

after the new shipper sale, *Crawfish Processors* requires the

Court to "revisit its decision, and based on the legal analysis

set forth above, find that CEO B, in fact, had acquired ownership

of Jinfu USA in October 2002, when all of the parties to the

transaction intended that the transfer of ownership take place."

*See* Pls.' Comments 21.  The court finds that plaintiffs overstate

the application of *Crawfish Processors* to the present matter.

The plaintiffs in *Jinfu III* made this same argument in

support of their contention that the Court should revisit its

holding that CEO B did not own Jinfu USA on the date of the

purported new shipper sale (November 2, 2002).  The *Jinfu III*

Court found that, unlike Jinfu PRC's situation, the petitioners

in *Crawfish Processors* "demonstrated that the transfer of

ownership itself took place [during the period of review]

notwithstanding the method of payment. . . ." *Jinfu III*, 32 CIT

at __, Slip Op. 08-38 at 16-17.  In contrast, here, as in *Jinfu*

*III*, the record evidence demonstrates that because the

Certificate of Transfer of Shares was dated October 25, 2003,

ownership did not pass until that date.  *See Id*. at __, Slip Op.

08-38 at 17.[16]  Consequently, the *Jinfu III* Court found, even if

it were to "'discount[] the importance of the time when final

payment was made,' as urged by plaintiff, it still could not

_____

[16]     The *Jinfu III* Court noted:

        The court has previously detailed six
        independent reasons in support of this
        conclusion.  They are that: (1) Yousheng USA
        was not renamed Jinfu USA until at least
        November 8, 2002; (2) either Mr. A or Mr. D
        owned Yousheng USA from its date of
        incorporation at least until its name was
        changed to Jinfu USA; (3) the Certificate of
        Transfer of Shares explicitly stated that it
        is to be "EFFECTIVE UPON EXECUTION BY THE
        UNDERSIGNED" and that the execution took
        place on December 30, 2003; (4) CEO B did not
        pay Mr. D the consideration for the shares
        until more than a year after November 2,
        2002; (5) the portion of the November 18,
        2002 Master Application for Jinfu USA's
        business license that asked if Yousheng USA
        was owned, controlled or affiliated with
        another entity was left blank; and (6) the
        tax return stating that Jinfu USA was wholly
        owned by CEO B was dated June 13, 2003,
        unsigned, and may never have been filed.

*Jinfu III*, 32 CIT at __, Slip Op. 08-38 at 17 (citations
omitted).

conclude that CEO B acquired [Jinfu USA] prior to November 2,
2002 because there is no documentary evidence that the
acquisition took place." *Jinfu III*, 32 CIT at __, Slip Op. 08-38
at 17-18.

As noted, the record in this case demonstrates that Jinfu
PRC had no ownership interest in Jinfu USA until, at the
earliest, the date of October 25, 2003 found on the Certificate
of Transfer of Shares: "[t]he earliest possible effective date of
the ownership transfer agreement would be October 25, 2003. . . .
The [Certificate of Transfer of Shares] is dated October 25, 2003
. . . ." *Shanghai Eswell I*, 31 CIT at __, Slip Op. 07-138 at 29;
29 n. 15; Remand Results at 28.  This is the very date used by
Commerce in this case in finding that ownership of Jinfu USA
transferred.  Accordingly, the court finds that the decision in
*Crawfish Processors* does not require it to revisit its ownership
analysis, because, regardless of when payment was made, ownership
did not transfer prior to October 25, 2003.

For the reasons above, the court finds that the Department
has complied with the court's remand instructions and sustains
the Department's finding that Jinfu PRC was not affiliated with
Jinfu USA prior to October 25, 2003.

CONCLUSION

For the foregoing reasons, the court sustains the

Department's Remand Results.  Judgment shall be entered

accordingly.


                                        ___/s/Richard K. Eaton___
                                          Richard K. Eaton


Dated:     November 18, 2008
           New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
SHANGHAI ESWELL ENTER. CO.,       :
LTD.; JINFU TRADING CO., LTD.;    :
and ZHEJIANG NATIVE PRODUCE       :
AND ANIMAL BY-PRODUCTS IMPORT     :
& EXPORT GROUP CORP.,             :   Before: Richard K. Eaton, Judge
                                  :
            Plaintiffs,           :   Court No. 05-00439
                                  :
      v.                          :
                                  :
UNITED STATES,                    :
                                  :
            Defendant,            :
                                  :
      and                         :
                                  :
THE AMERICAN HONEY PRODUCERS      :
ASSOCIATION OF AMERICA AND        :
THE SIOUX HONEY ASSOCIATION,      :
                                  :
            Def.-Ints.            :
_____:
```

<u>JUDGMENT</u>

This case having been submitted for decision and the court, after deliberation, having rendered a decision therein; now, in conformity with that decision, it is hereby

ORDERED that the United States Department of Commerce's Final Results of Redetermination Pursuant to Court Remand in *Shanghai Eswell Enterprise Co., Ltd. v. United States*, 31 CIT ___, Slip Op. 07-138 (Sept. 13, 2007), are sustained.

                                                 /s/Richard K. Eaton   
                                                 Richard K. Eaton

Dated:    November 18, 2008
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____      By: _____

Deputy Clerk